DANIEL L. WARSHAW (Bar No. 185365)
  dwarshaw@pswlaw.com
BOBBY POUYA (Bar No. 245527)
  bpouya@pswlaw.com
SOPHIE R. SEDAGHAT (Bar No. 336115)
  ssedaghat@pswlaw.com
**PEARSON, SIMON & WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104

RAYMOND P. BOUCHER (Bar No. 115364)
  ray@boucher.la
**BOUCHER LLP**
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367
Telephone:  (818) 340-5400
Facsimile:  (818) 340-5401

*Attorneys for Plaintiffs and the Proposed Class*

*(Additional Counsel on Signature Page)*

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONATHAN SMITH and ALEX YUAN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs<br><br>vs.<br><br>BANK OF AMERICA, N.A.; and DOES 1 through 10, inclusive,<br><br>Defendants. | CASE NO. 2:21-cv-3385<br><br>**CLASS ACTION COMPLAINT** |

PEARSON, SIMON & WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

952711.1

1.     Plaintiff Jonathan Smith and Plaintiff Alex Yuan (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, and through their attorneys of record, allege the following against Defendant Bank of America, N.A. ("Bank of America" or "BoA") and DOE Defendants 1 through 10 (the "DOE Defendants")(collectively, "Defendants") based upon personal knowledge with respect to themselves, on information and belief derived from investigation of counsel, and review of public documents as to all other matters.

## I.    **INTRODUCTION**

2.     In 2020, COVID-19 ravaged the world, marking one of the most serious pandemics in recorded history.  Countries shut down, one by one, in an effort to protect their populations from the virus – curtailing all but the most essential of activities.  In the United States, schools, businesses and workplaces were forced to close, resulting in mass unemployment.  As a result, Americans began applying for assistance from the State at unprecedented rates.

3.     The Employment Development Department (the "EDD") has taken a primary role in addressing the pandemic-related unemployment and joblessness of hundreds of thousands of California residents.  The EDD issues unemployment insurance benefits to entitled recipients through Visa debit cards associated with accounts at Bank of America ("BoA EDD Cards.")  For several years, Bank of America has had an exclusive contract with the EDD to facilitate access to such benefits.

4.     Despite the importance of unemployment insurance benefits amid the COVID-19 pandemic, Bank of America has taken a lackadaisical approach to securing such benefits – choosing to equip BoA EDD Cards with outdated, easy-to-hack magnetic strips, rather than EMV chips, which provide an added layer of security to card-based transactions.

5.     This decision has proven to be catastrophic, with BoA EDD Cards becoming the target of widespread fraud in mid-2020 and unemployment insurance

PEARSON, SIMON & WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

952711.1

benefits being stolen from EDD cardholders through a host of unauthorized transactions. Bank of America could have prevented this fraud with one simple measure: securing BoA EDD Cards with EMV chips, as it does with all other debit and credit cards it issues.

6. In an effort to address the fraud, Bank of America, in October 2020, froze the accounts of roughly 350,000 EDD cardholders. Bank of America also reversed credits given to EDD cardholders for fraudulent withdrawals, creating a negative balance in many EDD cardholders' accounts. With these actions, Bank of America has effectively deprived EDD cardholders of unemployment insurance benefits to which they are lawfully entitled and on which they heavily rely. Notably, many EDD cardholders remain unable to access their unemployment insurance benefits to date – months after Bank of America first froze their accounts.

7. For the reasons set forth herein, Defendants are liable for (a) violations of the California Consumer Privacy Act, Cal. Civ. Code § 1798.100, *et seq.*; (b) negligence; (c) negligent failure to warn; (d) violations of Regulation E of the federal Electronic Funds Transfer Act, 15 U.S.C. § 1963, *et seq.* and 12 C.F.R. § 205.1, *et seq.*; (e) breach of contract; and (f) violations of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*

## II.  **PARTIES**

8. Plaintiff Jonathan Smith is an individual residing in Los Angeles, California. Smith became unemployed during the COVID-19 pandemic and receives unemployment insurance benefits from the EDD.

9. Plaintiff Alex Yuan is an individual residing in San Jose, California. Yuan became unemployed during the COVID-19 pandemic and receives unemployment insurance benefits from the EDD.

10. Defendant Bank of America, N.A. is an American multinational bank and financial services holding company. It is one of the Big Four banking

PEARSON, SIMON & WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

952711.1

institutions of the United States and the eighth largest bank in the world.[1] Bank of America is a Delaware corporation with its principal place of business in North Carolina.

11. Plaintiffs do not currently know the true names and capacities of the defendants sued herein as DOES 1 through 10 (the "DOE Defendants.") Therefore, Plaintiffs sue the DOE Defendants by fictitious names. Upon information and belief, each DOE Defendant, individually and collectively, is legally responsible in some manner for the acts and omissions alleged herein. Plaintiffs will amend this Complaint to reflect the true names and capacities of the DOE Defendants when such information becomes known.

12. Upon information and belief, Plaintiffs allege that Bank of America and the DOE Defendants, individually and collectively, are and, at all times relevant to this action have been, the agents, servants, or employees of each other, acting within the scope of such agency, service, or employment in carrying out the acts and omissions alleged herein. Upon information and belief, Plaintiffs further allege that, at all times relevant to this action, each Defendant acted at the direction of, or with the full knowledge, permission, or consent of, the other Defendants. Furthermore, Plaintiffs allege that the acts or omissions of each Defendant alleged herein were made known to, and approved by, the other Defendants. Accordingly, the Defendants are alleged to be jointly and severally liable for the acts and omissions alleged herein.

### III. <u>JURISDICTION AND VENUE</u>

13. This Court has subject matter jurisdiction pursuant to: (i) the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d) as the amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are

---

[1] *Bank of America*, WIKIPEDIA, https://en.wikipedia.org/wiki/Bank_of_America (last visited Apr. 8, 2021).

952711.1

PEARSON, SIMON & WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

more than 100 putative class members, and minimal diversity exists because putative class members are citizens of a different state than Defendants; (ii) 28 U.S.C. § 1331 with respect to the cause of action arising under the federal law, the Electronic Funds Transfer Act (15 U.S.C. § 1693, *et seq.*); and (iii) 28 U.S.C. § 1367 with respect to the causes of action arising under the laws of the state of California.

14.     This Court has personal jurisdiction over Defendant Bank of America because it is authorized to, and regularly conducts, business in the state of California.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the acts or omissions giving rise to the claims set forth in this Complaint occurred in this District.

## IV.     FACTUAL ALLEGATIONS

### A.     COVID-19 and an Ensuing Unemployment Crisis

16.     In December 2019, the first case of coronavirus disease 2019 ("COVID-19"), a highly-contagious respiratory disease, was identified in Wuhan, China.  Within weeks, China was placed on a country-wide lockdown to contain the outbreak.  Due to its highly transmissible nature, the virus transcended borders and quickly spread across the world.  The crisis was officially declared a pandemic by the World Health Organization and countries, one by one, began instituting mandatory quarantines that prevented movement outside the home except for essential activities.[2] On March 19, 2020, California became the first U.S. state to institute a mandatory stay-at-home order; by the end of the month, virtually every state had instituted its own form of lockdown.  Schools, businesses, and workplaces were all forced to close.[3]

---

[2] *See Timeline – COVID-19*, WORLD HEALTH ORGANIZATION (Apr. 27, 2020), *https://www.who.int/news/item/27-04-2020-who-timeline---covid-19*.

[3] *See* Kathy Katella, *A Pandemic Year – A COVID-19 Timeline*, YALE MEDICINE (Mar. 9, 2021), https://www.yalemedicine.org/news/covid-timeline.

PEARSON, SIMON & WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

952711.1

PEARSON, SIMON & WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

17.    Millions of Americans became unemployed as a direct result of the COVID-19 pandemic.  Between mid-March and June 2020, 49 million Americans filed for unemployment insurance benefits, compared to only 3.3 million over the same period, one year earlier.[4]   The numbers were just as striking in California.  Today, more than one year after the pandemic began, unemployment rates in California remain exceedingly high.[5]

**B.**    **The Employment Development Department and Its Contract with Bank of America**

18.    The EDD provides a variety of services to California businesses, workers, and job seekers, including, but not limited to, Unemployment Insurance, Disability Insurance, and Paid Family Leave.[6]   In California, the EDD has taken a primary role in addressing the employment-based needs of those impacted by the COVID-19 pandemic.

19.    Since 2010, Bank of America has had an exclusive unemployment debit card contract with the state of California.  Under the terms of the contract, the EDD disperses unemployment insurance benefits to individuals entitled to such benefits ("EDD cardholders") through BoA EDD Cards, taking the place of paper checks.  Bank of America retains exclusive control over account management, fund processing, and fraud detection for BoA EDD Cards, such that the EDD lacks the authority to direct Bank of America to refund an EDD cardholder in the event of fraud,

---

[4] Paul Fronstin and Stephen A. Woodbury, *How Many Americans Have Lost Jobs with Employer Health Coverage During the Pandemic?*, THE COMMONWEALTH FUND (Oct. 7, 2020), https://www.commonwealthfund.org/publications/issue-briefs/2020/oct/how-many-lost-jobs-employer-coverage-pandemic#1.

[5] *See* https://edd.ca.gov (last visited Apr. 8, 2021).

[6] *See Employment Development Department*, WIKIPEDIA, https://en.wikipedia.org/wiki/Employment_Development_Department (last visited Apr. 8, 2021).

952711.1

1  theft, or loss.[7]

2      **C.**    **Bank of America's "Zero Liability" Policy**

3         20.    EDD cardholders must agree to the terms and conditions of the

4  "California Employment Development Department Debit Card Account Agreement"

5  (the "Account Agreement") to begin using their BoA EDD Cards.  On the issue of

6  liability in the case of fraud, theft, or loss, the Account Agreement states that EDD

7  cardholders are entitled to the level of protection provided by Regulation E, a federal

8  statute.  However, Bank of America voluntarily extends this protection with its "Zero

9  Liability Policy for Unauthorized Transactions" (hereinafter, "Zero Liability Policy.")

10         21.    The Zero Liability Policy states, in pertinent part: "Federal law

11  [Regulation E] . . . may limit your liability for unauthorized transactions on your

12  account, *but you may still be liable in some circumstances* [emphasis added].  Under

13  the Bank of America 'zero liability' policy, you may incur no liability for

14  unauthorized use of your Card up to the amount of the unauthorized transaction,

15  provided you notify us within a reasonable time thereafter."  On what constitutes a

16  "reasonable time" in which to report fraud, Bank of America states: "Reasonable time

17  will be determined in [its] sole discretion based on the circumstances but will not be

18  less than the [2 business day] time frame specified under the Electronic Funds

19  Transfer Act or Regulation E."

20         22.    Thus, an EDD cardholder who may be liable for fraud, theft, or

21  loss under Regulation E would likely not incur any liability under Bank of America's

22  Zero Liability Policy with timely notice to Bank of America of such fraud, theft, or

23  loss.

24  / / /

---

26  [7] Lauren Hepler and Stephen Counsel, *How Bank of America Helped Fuel
27  California's Unemployment Meltdown*, CAL MATTERS (Nov. 20, 2020),
https://calmatters.org/economy/2020/11/how-bank-of-america-helped-fuel-
28  californias-unemployment-meltdown/.

952711.1

PEARSON, SIMON & WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

**D.    Bank of America's "24-Hour" Customer Service for EDD Cardholders**

23.    Bank of America also informs EDD cardholders that its customer service department is available around-the-clock to assist EDD cardholders with suspected fraud, theft, or loss.  For example, on its *"Cardholder Frequently Asked Questions"* page, found on the Bank of America EDD website, Bank of America states:

> **What are the Bank of America EDD Debit Card Customer Service hours?**
>
> *For your convenience automated account information and dedicated customer service representatives are available 24 hours a day, 7 days a week by calling 1.866.692.9374 or you can go online at wwww.bankofamerica.com./eddcard.*
>
> **Who should I call with questions about my EDD Debit Card account?**
>
> *The toll-free Bank of America EDD Debit Card Customer Service number is 1.866.692.9374 and is displayed on the back of your card, as well as within your user guide information.  You may also obtain account information via online customer service at* www.bankofamerica.com/eddcard*.*
>
> **Can I use my local Bank of America banking center for customer service on this account**?
>
> *Banking centers can assist with teller Cash Access transactions and standard checking and savings accounts, but not with detailed account and balance information for the EDD Debit Card.  For all other EDD Debit Card service needs, visit* www.bankofamerica.com/eddcard *or call the toll-free Bank of America EDD Debit Card Customer Service number at 1.866.692.9374.*

24.    As the foregoing FAQs demonstrate, Bank of America's distinct EDD Customer Service phone number and website are the only means by which EDD cardholders may submit customer service requests or obtain detailed account and balance information related to their BoA EDD Benefits accounts.

/ / /

/ / /

PEARSON, SIMON & WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

952711.1

CLASS ACTION COMPLAINT

PEARSON, SIMON & WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

E.    **Bank of America's Use of Outdated, Easy-to-Hack Magnetic Strip EDD Cards**

25.    BoA EDD Cards are not equipped with "EMV" chips.  An "EMV" chip (named after Europay, Mastercard, and Visa – the companies that developed the technology) is a small, metallic computer chip that creates a unique transaction code each time the chip is inserted into a card reader to make a purchase.  An EMV chip provides greater security to card-based transactions than a traditional magnetic strip, which uses the same transaction data each time the card is swiped to make a purchase. Accordingly, cards with traditional magnetic strips are easy for hackers to target.  All a hacker would need to create a duplicate card, which could then be sold on the black market, is data from a *single* purchase made using the card and the cardholder's personal identification number (PIN).[8]

26.    Cards equipped with EMV chips are now the standard in terms of credit card security, and cards with magnetic strips are widely regarded as outdated and obsolete.  In fact, as of late 2017, 85% of all credit and debit cards issued to American consumers had EMV chips.[9]

F.    **Bank of America's Responsibility for the Widespread Hack of BoA EDD Cards**

27.    In late 2014, Bank of America announced that it would equip "all new and reissued" debit cards with EMV chips, basing its decision on the fact that

---

[8] *See* Brendan Harkness, *Chip Credit Cards: EMV, Chip-and-Pin, and Chip-and-Signature*, CREDIT CARD INSIDER (Aug. 21, 2020), https://www.creditcardinsider.com/learn/chip-and-signature-chip-and-pin-emv-cards/.

[9] *Chip Card Security: Why Is EMV More Secure?*, SQUARE, https://See /squareup.com/us/en/townsquare/why-are-chip-cards-more-secure-than-magnetic-stripe-cards (last visited Mar. 29, 2021).

952711.1

1  chip-enabled cards provide increased security to card-based transactions.[10]

2      28.    In regard to the increased security provided by EMV chips, Bank

3  of America, states on its website: "We're making your cards more secure.  Chip card

4  technology – enhanced protection for your credit and debit cards when used at chip-

5  enabled terminals.[11]  It continues:

6      <u>Added layer of security</u>

7      The new chip on your card provides additional security
       when used at terminals and ATMs that are chip-enabled –
8      the data stored on the chip is more difficult to counterfeit or
       copy.[12]

9      29.    Bank of America echoes this statement on its "*Chip Card FAQs*"

10  page, in response to the question, "Are chip cards secure?":

11     Chip technology has been around for over 20 years and is
       the credit and debit card security standard in many countries
12     around the world.  When purchases are made using the chip
       feature at chip-enabled terminals, the transaction is more
13     secure because of the process used to determine if the card
       is authentic.    This makes the card more difficult to
14     counterfeit or copy.

15     Chip technology is the next step in providing enhanced
16     security to our card users.[13]

17     30.    Finally, in response to the question, "Will chip cards prevent

18  merchant compromises?" Bank of America states:

19     Chip card technology provides an additional level of

20  ───────────────
    [10] *See Bank of America Begins Rollout of Chip Debit Cards*, BUSINESSWIRE (Sept. 30,
21  2014),    https://www.businesswire.com/news/home/20140930005292/en/Bank-of-
    America-Begins-Rollout-of-Chip-Debit-Cards.
22

23  [11] *Chip Card Technology*, BANK OF AMERICA,
    https://www.bankofamerica.com/security-center/accounts-cards/emv-chip-card-
24  technology/ (last visited Apr. 8, 2021).

25  [12] *Id.*

26  [13] *EMV Chip Card FAQs*, BANK OF AMERICA,
27  https://www.bankofamerica.com/security-center/faq/emv-chip-card/ (last visited
    Apr. 8, 2021).
28
    952711.1

PEARSON, SIMON & WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

CLASS ACTION COMPLAINT

PEARSON, SIMON & WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

security when used at a chip-enabled terminal. The technology may help reduce certain types of fraud that can result from third-party or merchant compromise. Chip cards use dynamic information for each transaction that is verified by the card issuer making it more difficult to capture the customer's card data and create new fraudulent cards that can be used elsewhere.

31.    Thus, Bank of America knows that EMV chips provide greater security to card-based transactions than traditional magnetic strips.

32.    Despite knowing that magnetic strips are more susceptible to fraud, Bank of America decided to use them on BoA EDD Cards, instead of EMV chips.

33.    Upon information and belief, BoA EDD cards are the only debit or credit cards Bank of America issues that do not have EMV chips.[14]

34.    In mid-2020, between hundreds and thousands of dollars' worth of unemployment insurance benefits were fraudulently stolen from EDD cardholders through a host of unauthorized transactions. These unauthorized transactions included unauthorized ATM withdrawals and unauthorized purchases on food delivery apps, such as DoorDash and Postmates, and at major retailers, like Target and CVS.[15] In some instances, EDD cardholders reported never having even used

---

[14] *Id.*

[15] Michael Finney and Renee Koury, *California Unemployment: Bank of America Reveals It Paid Millions to 'Double-Dipping' EDD Fraudsters*, ABC 7 NEWS, (Dec. 10, 2020), https://abc7news.com/bank-of-america-edd-empty-accounts-fraud-cases-california-unemployment/8672981/. *See also* Kenny Choi, *Victims of Bank of America EDD Debit Card Fraud Tell Stories of Fake Charges, Long Waits, Closed Claims, CBSN SF* (Dec. 22, 2020), https://sanfrancisco.cbslocal.com/2020/12/22/victims-of-bank-of-america-edd-debit-card-fraud-tell-stories-of-closed-claims-frustration-loss/.

their BoA EDD Cards.[16]

35.    To combat the rampant fraud, in October 2020, Bank of America froze approximately 350,000 unemployment insurance accounts.[17]  In doing so, Bank of America deprived EDD cardholders of access to unemployment insurance benefits to which they are lawfully entitled.  Today, an overwhelming number of frozen BoA EDD Benefits accounts have yet to be reactivated.

36.    In addition to freezing targeted accounts, Bank of America reversed credits it had previously granted impacted EDD cardholders for fraudulent withdrawals from their BoA EDD Benefits accounts.[18]  This created negative balances in many BoA EDD Benefits accounts, depriving EDD Cardholders of unemployment insurances benefits, as any subsequent deposit by the EDD into an account was applied against the negative account balance created by Bank of America.

37.    Bank of America bears direct responsibility for this fraud, which, upon information and belief, would not have occurred had it simply equipped BoA EDD Cards with EMV chips, as it does with all other BoA debit and credit cards, and which are the industry standard.

38.    Adding insult to injury, impacted EDD cardholders turned to Bank of America's EDD Customer Service line, as instructed, and were met with long

---

[16] *See* David Gotfredson, *California Unemployment: Fraudulent Charges Keep Popping Up on EDD Debit Card Accounts*, CBS 8 (Jan. 21, 2021), https://www.cbs8.com/article/money/fraudulent-charges-edd-debit-card-accounts/509-5a8b0958-0b56-41fe-81af-e3ce446d0690.

[17] *Bank of America Freezes EDD Accounts of Nearly 350,000 Unemployed Californians for Suspected Fraud*, CBS LA (Oct. 29, 2020), https://losangeles.cbslocal.com/2020/10/29/bank-of-america-freezes-edd-accounts-of-nearly-350000-unemployed-californians-for-suspected-fraud/.

[18] *See e.g.*, Matt Fountain, *Bank of America Froze SLO County Residents' Unemployment Benefits Because of Fraud*, THE TRIBUNE (Dec. 17, 2020), https://www.sanluisobispo.com/news/local/article247729155.html.

952711.1

PEARSON, SIMON & WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

PEARSON, SIMON & WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1  delays, dropped calls, and illusive answers as to when they could expect a resolution.
2  This, despite Bank of America's representations of a "24-hour" customer service line
3  dedicated specifically to EDD Cardholders and said phone number being the only
4  means by which EDD Cardholders could receive direct information regarding their
5  BoA EDD Benefits accounts.

6  **G.**   **Plaintiffs' Experience with EDD-Related Fraud and Bank of**
7  **America's Ineffective Response**

8  **1.**   ***Plaintiff Jonathan Smith***

9  39.    Plaintiff Jonathan Smith resides in Los Angeles, California.

10  40.    Smith became unemployed as a result of the COVID-19 pandemic
11  and applied for unemployment insurance benefits from the EDD.  The EDD approved
12  Smith's request and issued him a BoA EDD Card.

13  41.    Around fall of 2020, Smith attempted to use his BoA EDD Card
14  at a Bank of America ATM and was surprised to learn that his BoA EDD Benefits
15  account displayed a negative balance, despite – to his knowledge – there being
16  adequate funds therein.  Smith quickly realized that he had been the victim of fraud
17  and that an unauthorized withdrawal had drained his account of approximately $900.
18  Notably, Bank of America did not notify Smith of the unauthorized withdrawal; he
19  made the unsettling discovery himself only after the ATM displayed an account
20  balance far lower than he had expected.

21  42.    Smith immediately reported the fraud to Bank of America.  Bank
22  of America opened an investigation into the matter and temporarily credited $900 to
23  his BoA EDD Benefits account.

24  43.    Thereafter, Bank of America concluded its investigation,
25  determining that fraudulent activity had, in fact, occurred.  Thus, the $900 credit to
26  Smith's BoA EDD Benefits account became permanent.

27  44.    Approximately one month later, despite concluding that Smith
28  had been the victim of fraud, Bank of America reversed the $900 "permanent" credit

952711.1

1  – without notice or explanation.  This left Smith's BoA EDD Benefits account with a

2  negative balance.  As with the fraudulent withdrawal, Bank of America failed to

3  provide notice; Smith discovered the credit reversal himself, only after his BoA EDD

4  card was declined for insufficient funds.

5       45.    Subsequent deposits by the EDD into Smith's BoA EDD Benefits

6  account were applied against the negative balance created by Bank of America,

7  depriving him of hundreds of dollars' worth of unemployment insurance benefits.

8       46.    Besides inexplicably reversing the $900 "permanent" credit, Bank

9  of America also froze Smith's BoA EDD Benefits account – once again, without

10  notice or explanation.

11       47.    Smith repeatedly contacted Bank of America's EDD customer

12  service phone number for assistance with the matter.  Like many other EDD

13  cardholders, Smith was subjected to inordinately long wait times and dropped calls.

14  On the rare occasion in which  Smith managed to get into contact with actual customer

15  service representatives, they behaved discourteously toward him and accused him of

16  lying about his circumstances.  Smith is not alone in his experience with Bank of

17  America's purported "24/7" EDD customer service line.

18       48.    With his BoA EDD Benefits account frozen, Smith was unable to

19  access his unemployment insurance benefits for months.  During that period, Smith

20  suffered severe stress and anxiety wondering how he would be able to pay for basic

21  necessities, including, but not limited to, rent, groceries, and therapy.  Smith was

22  ultimately forced to borrow money from friends and family to cover said costs.

23       49.    Although Bank of America ultimately issued Smith a permanent

24  credit for the amount of the unauthorized transaction, the damage had already been

25  done – he had suffered needlessly for months as a direct result of Bank of America's

26  reckless decision to leave BoA EDD Cards susceptible to theft, fraud, and

27  unauthorized use.

28  / / /

PEARSON, SIMON & WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

952711.1

PEARSON, SIMON & WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

2.     ***Plaintiff Alex Yuan***

50.     Plaintiff Alex Yuan is an individual residing in San Jose, California.

51.     Yuan became unemployed as a result of the COVID-19 pandemic and applied for unemployment insurance benefits from the EDD.  The EDD approved his request and issued him a BoA EDD Card.

52.      In or around August 2020, two separate unauthorized ATM withdrawals from Yuan's BoA EDD Benefits account were made in Los Angeles, California – each for $900.

53.     Yuan immediately reported the fraud to Bank of America.  Bank of America opened an investigation into the matter, and, in September 2020, temporarily credited $1,800 to his BoA EDD Benefits account.

54.     In October 2020, Bank of America concluded its investigation, determining that the ATM withdrawals were, in fact, fraudulent.  Thus, the $1,800 credit to Yuan's BoA EDD Benefits account became permanent.

55.     Shortly thereafter, despite concluding that Yuan had been the victim of fraud, Bank of America reversed the $1,800 "permanent" credit – without notice or explanation.  This left Yuan's BoA EDD Benefits account with a negative balance.  Subsequent deposits by the EDD into his BoA EDD Benefits account were applied against this negative balance, depriving Yuan of hundreds of dollars' worth of unemployment insurance benefits.

56.     Yuan repeatedly contacted Bank of America's EDD customer service phone number for assistance with the matter.  Like many other impacted EDD cardholders, Yuan experienced long wait times, dropped calls, and illusive answers as to why the credit had been reversed and when he could expect a resolution of the matter.

57.     While continuing to deal with the impact of the first two fraudulent withdrawals, Yuan's BoA EDD Benefits Account experienced yet another

PEARSON, SIMON & WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1  unauthorized withdrawal for $900, bringing the total amount of fraudulent
2  withdrawals to his account to $2,700.

3      58.    Because Bank of America had failed to adequately safeguard his
4  BoA EDD Benefits account, Yuan thereafter set up automated transfers, so that any
5  unemployment insurance benefits dispersed into his BoA EDD Benefits account
6  would be moved into a different, more secure account.  Additionally, Yuan – using
7  the Bank of America mobile phone application – disabled the ATM feature on his
8  BoA EDD Benefits account so that ATM withdrawals could no longer be made.

9      59.    In December 2020, Bank of America notified Yuan by mail that it
10  had frozen his BoA EDD Benefits account and that it was investigating the fraud to
11  said account.

12      60.    Thereafter, Bank of America – without notice to Yuan – unfroze
13  his BoA EDD Benefits account and unemployment insurance benefits were deposited
14  by the EDD into said account.  Due to the measures Yuan had taken to protect his
15  account, these funds were protected.  At this point, Yuan directed the EDD to no
16  longer deposit funds into his BoA EDD Benefits account, but to instead send him his
17  unemployment insurance benefits in the form of paper checks.

18      61.    Had Yuan not personally instituted the security measures
19  described above, it is likely that his BoA EDD Benefits account would have fallen
20  victim to yet another unauthorized withdrawal.

21      62.    Yuan remains entitled to several thousand dollars' worth of
22  employment insurance benefits which were applied against the negative balance in
23  his BoA EDD Benefits account, erroneously created by Bank of America after it
24  reversed an $1,800 credit granted to Yuan despite concluding that he had, in fact, been
25  the victim of fraud.

26      **V.    CLASS ACTION ALLEGATIONS**

27      63.    Plaintiffs bring this action as a class action pursuant to Federal
28  Rule of Civil Procedure 23 on behalf of themselves and all others similarly situated

952711.1

CLASS ACTION COMPLAINT

as members of the following subclasses (collectively, the "Class"):

**Declaratory and Injunctive Relief Subclass:**

All persons who were issued a BoA EDD Card in order to access EDD unemployment insurance benefits during the period from March 1, 2020 to the present (the "Class Period.")

**The Access Denial Subclass**:

All persons who were issued a BoA EDD Card in order to access EDD unemployment insurance benefits who were denied access to unemployment insurance benefits, in whole or in part, due to Defendants' decision to freeze accounts during the Class Period.

**The Regulation-E Subclass**:

All persons who were issued a BoA EDD Card in order to access EDD unemployment insurance benefits who, during the Class Period, reported a fraudulent transaction on their BoA EDD Card, were granted a credit, and subsequently had the credit reversed by Defendants.

64.     Subject to additional information obtained through further investigation, fact collection and discovery, the definition of the Class may be expanded or narrowed by further amendment.

65.     Excluded from the Class are Defendants themselves, any entity in which any Defendant has a controlling interest, and Defendants' officers, directors, legal representatives, successors, subsidiaries, and assigns.  Also excluded from the Class are any judicial officers presiding over this matter, members of their immediate family, members of their judicial staff, and any judge sitting in the presiding court system who may hear an appeal of any judgment entered.

66.     This action has been brought and may be properly maintained on behalf of the Class proposed herein under Rule 23 of the Federal Rules of Civil Procedure and satisfies the numerosity, commonality, predominance, typicality, adequacy, and superiority requirements of its provisions.

67.     **Numerosity**.  The members of the Class are so numerous as to render their individual joinder impracticable.  Although the precise number of Class members is unknown, upon information and belief, Plaintiffs allege that the Class contains hundreds of thousands of members.  The true number of Class members is

PEARSON, SIMON & WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

952711.1

known by Defendants, however, and thus, Class members may be notified of the pendency of this action through electronic mail, first class mail, and/or by published notice.

68. **Commonality and Predominance**.  Common questions of law and fact applicable to all members of the Class predominate over questions affecting only individual Class members.  These common legal and factual questions include, but are not limited to, the following:

(a) Whether Defendants' decision not to equip BoA EDD Cards with EMV chips was reasonable;

(b) Whether Defendants breached the duty of care they owed to EDD cardholders;

(c) Whether Defendants' decision not to equip BoA EDD Cards with EMV chips proximately caused Class members to lose access to their unemployment insurance benefits;

(d) Whether Defendants violated Regulation E or the terms of the Account Agreement by reversing credits granted for fraudulent transactions;

(e) Whether Defendants are in breach of contract with EDD cardholders;

(f) Whether Defendants engaged in unlawful, unfair, or fraudulent business acts or practices in violation of California's Unfair Competition Law (Cal. Bus. & Prof Code §§ 17200, *et seq*.);

(g) Whether Plaintiffs and Class members are entitled to damages;

(h) Whether Plaintiffs and Class members are entitled to restitution; and

(i) Whether Plaintiffs and Class members are entitled to declaratory and injunctive relief.

/ / /

952711.1

PEARSON, SIMON & WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

69.   **Typicality**.  Plaintiffs' claims are typical of other Class members' claims because Plaintiffs and Class members were subjected to the same allegedly unlawful conduct and damaged in the same way, *i.e.*, all had fraudulent transactions made on their BoA EDD cards and were denied access to their unemployment insurance benefits due to Defendants' decision to freeze their BoA EDD Benefits accounts.

70.   **Adequacy of Representation**.   Plaintiffs will fairly and adequately represent the Class.  Plaintiffs have the best interests of the members of the Class in mind.  Plaintiffs have no conflicts of interest with the Class.  Plaintiffs' counsel are competent and experienced in litigating class actions, including extensive experience in consumer protection claims.  Plaintiffs intend to vigorously prosecute this case. '

71.   **Superiority**.  A class action is superior to other available methods for the fair and efficient adjudication of these claims because individual joinder of the claims of all members of the Class is impracticable.  Many members of the Class are without the financial resources necessary to pursue this matter.  Even if some could afford to litigate claims separately, such a result would be unduly burdensome to the courts in which the individualized cases would proceed.   Individual litigation increases the time and expense of resolving a common dispute concerning Defendants' actions toward an entire group of individuals.  Class action procedures allow for far fewer management difficulties in matters of this type and provide the unique benefits of unitary adjudication, economies of scale, and comprehensive supervision over the entire controversy by a single judge in a single court.

72.   Adequate notice can be given to Class members directly using information maintained in Defendants' records or, if necessary, through notice by publication.

73.   Damages may be calculated from data maintained in Defendants' records, so that the cost of administering recovery for the Class can be minimized.

PEARSON, SIMON & WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

952711.1

The precise measure of damages available to Plaintiffs and Class members, however, is not a barrier to class certification.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Violation of the California Consumer Privacy Act

### (on behalf of the Access Denial Class)

74.    Plaintiffs reallege and incorporates paragraphs 1 through 73, as if fully set forth herein.

75.    The California Consumer Privacy Act ("CCPA"), Cal. Civ. Code § 1798.100, *et seq*., is a state statute designed to enhance privacy rights and consumer protection for California residents.  More specifically, the CCPA provides a civil cause of action for individuals whose personal information falls victim to  theft, fraud, disclosure, or any other unauthorized access as a result of a business or company's failure to reasonably protect such personal information.

76.     Plaintiffs and Class members are "consumers" as defined in the CCPA.

77.    Defendants are "businesses" as defined in the CCPA.  They are therefore subject to liability under the CCPA.

78.    Defendants collected Plaintiffs' and Class members' "personal information" as defined in the CCPA, including, but not limited to their: (i) first names or first initials; (ii) last names; (iii) account numbers or credit/debit card numbers; and (iv) security codes, access codes, or passwords that would enable access into their BoA EDD Benefits accounts.

79.    Upon information and belief, Plaintiffs' and Class members' personal information was obtained, stored, and/or transferred in a manner that allowed unauthorized individuals to access such information in contravention of the CCPA.

80.    As "businesses" under the CCPA, Defendants had a legal duty thereunder to take reasonable measures to protect Plaintiffs' and Class members'

952711.1

PEARSON, SIMON & WARSHAW, LLP<br>15165 VENTURA BOULEVARD, SUITE 400<br>SHERMAN OAKS, CALIFORNIA 91403

personal information.

81.    Defendants breached this duty by, among other things, deciding to equip BoA EDD Cards with easy-to-hack magnetic strips, rather than EMV chips.

82.    Defendants further breached this duty by transferring information pertaining to Plaintiffs' and Class members' BoA EDD Cards to ill-secured data storage devices, including at the EDD.

83.    Defendants' failure to reasonably protect Plaintiffs' and Class members' personal information directly and proximately caused such personal information to fall victim to theft, fraud, disclosure, or unauthorized access.

84.    Defendants knew that equipping BoA EDD Cards with magnetic strips would make Plaintiffs' and Class members' personal information susceptible to theft, fraud, disclosure, or unauthorized access, and that the absence of EMV chips made such a result highly foreseeable. In fact, Bank of America made the decision in 2014 to feature EMV chips on all new and reissued debit and credit cards for this very reason.

85.    Plaintiffs and Class members were injured by Defendants' acts and/or omissions in that they were deprived of access to their unemployment insurance benefits. BoA EDD Cards continue to feature magnetic strips and therefore, Plaintiffs and Class members remain vulnerable to future fraud, theft, or loss.

86.    Plaintiffs and Class members seek relief under Cal. Civ. Code §1798.150(a), including, but not limited to, recovery of: (i) actual damages; (ii) statutory damages; (iii) declaratory relief; (iv) injunctive relief; (v) attorneys' fees; (vi) litigation costs and expenses; and (vii) any other relief the Court deems proper.

### SECOND CAUSE OF ACTION

### Negligence (on behalf of the Access Denial Class)

87.    Plaintiffs reallege and incorporate paragraphs 1 through 73, as if fully set forth herein.

88.    By issuing BoA EDD Cards – the default method through which

952711.1

PEARSON, SIMON & WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

the EDD delivers unemployment insurance benefits to qualified recipients – Defendants had a duty of care to take reasonable security measures to prevent BoA EDD Cards from being targeted by unauthorized users.

89.    Defendants breached that duty by, among other things, failing to equip BoA EDD Cards with EMV chips and instead using outdated, easy-to-hack magnetic strips.

90.    Defendants' failure to equip BoA EDD Cards with EMV Chips directly and proximately caused the accounts of nearly 350,000 unemployed California residents to become frozen during the COVID-19 pandemic.

91.    Plaintiffs and Class members suffered damages as a result of Defendants' conduct.

92.    Plaintiffs and Class members are legally entitled to damages, as well as injunctive relief requiring that Defendants institute basic security measures, *e.g.*, equipping newly issued BoA EDD Cards with EMV chips, to avoid mass account lockouts in the future.

93.    Plaintiffs and Class members should be awarded attorneys' fees pursuant to, *inter alia*, Cal. Code Civ. Proc. § 1021.5.

## <u>THIRD CAUSE OF ACTION</u>

### **Negligent Failure to Warn (on behalf of the Access Denial Class)**

94.    Plaintiffs reallege and incorporate paragraphs 1 through 73, as if fully set forth herein.

95.    Defendants had actual or constructive knowledge of the susceptibility of magnetic stripe technology to theft, fraud, or unauthorized access.

96.    Defendants had a duty to exercise reasonable care to warn EDD cardholders that BoA EDD Cards – equipped with easy-to-hack magnetic strips – were susceptible to theft, fraud, or unauthorized access.

97.    Defendants breached this duty by failing to adequately warn EDD Cardholders of the susceptibility of magnetic strips to theft, fraud, or unauthorized

PEARSON, SIMON & WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

952711.1

CLASS ACTION COMPLAINT

PEARSON, SIMON & WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

access.

98.    Plaintiffs and Class members were harmed as a direct and proximate result of Defendants' breach.  Due to Defendants' breach, Plaintiffs and Class members have been deprived of unemployment insurance benefits to which they are lawfully entitled.

99.    Defendants' failure to warn was wanton, willful, and/or in reckless disregard of Plaintiffs' and Class members' rights.  As such, Plaintiffs and Class members are entitled to punitive damages.

100.    Defendants' continuing failure to warn EDD cardholders of the susceptibility of magnetic stripes to theft, fraud, or unauthorized access is causing irreparable harm to Plaintiffs and Class members, whose unemployment insurance benefits remain vulnerable to such conduct.   Accordingly, Plaintiffs and Class members seek injunctive relief, and any and all damages or restitution, in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### Violation of The Electronic Funds Transfer Act 15 USC § 1963, *et seq*. and 12 C.F.R. § 205.1, *et seq*. (on behalf of the Regulation E Class)

101.    Plaintiffs reallege and incorporate paragraphs 1 through 73, as if fully set forth herein.

102.    Plaintiffs bring this cause of action pursuant to the United States Electronic Funds Transfer Act ("EFTA") and 12 C.F.R. § 205.1 to 205.20 (Regulation E of the EFTA).

103.    Defendants engaged in unlawful conduct under Regulation E by seizing unemployment insurance benefits to which EDD cardholders are lawfully entitled.

104.    12 C.F.R. § 205.6(b)(1) states that consumer liability for unauthorized transfers, provided that the consumer notified the financial institution within two business days after learning of the loss or theft, is limited to "the lesser of

952711.1

$50 or the amount of unauthorized transfers that occur before [such] notice." Plaintiffs notified Bank of America of the fraudulent transaction within two business days after it occurred. Yet, Plaintiffs effectively incurred several hundred dollars in liability. Upon information and belief, many other Class members notified Bank of America of fraudulent activity in a timely manner and, like Plaintiffs, are also limited to $50 in liability, as per 12 C.F.R. § 205.6(b)(1).

105. With respect to fraudulent activity that is not reported to the financial institution within two business days, 12 C.F.R. § 205.6(b)(2) limits consumer liability to a maximum of $500. Upon information and belief, Class members who provided notice to Bank of America beyond the requisite 48-hour period were debited by Bank of America the entire amount of the provisional credit in excess of the limits set by 12 C.F.R. § 205.6(b).

106. With respect to any Class members who did not directly notify Bank of America of fraudulent activity on their BoA EDD Cards, Bank of America had constructive notice of the unauthorized electronic funds transfers pursuant to 12 C.F.R. § 205.6(b)(5)(iii). A multitude of BoA EDD Benefits accounts fell victim to unauthorized electronic funds transfers and, upon information and belief, many were reported in a timely manner to Bank of America. Upon receiving a significant number of these calls, Bank of America was put on constructive notice of such fraud.

107. In no event should the liability of any Class member exceed $500 under 12 C.F.R. § 205.6. Bank of America has violated 12 C.F.R. § 205.6 by making unemployed Californians liable for thousands of dollars, in conflict with federal law.

108. Defendants' violation of Regulation E has directly and proximately caused Plaintiffs and Class members to lose unemployment insurance benefits to which they are lawfully entitled.

109. Plaintiffs, on behalf of themselves and Class members, seek: (a) an injunction prohibiting Defendants from unlawfully debiting unemployment insurance benefits; (b) restitution of all unemployment insurance benefits unlawfully

PEARSON, SIMON & WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

952711.1

1  debited by Defendants; and (c) statutory damages.

2  110.  Additionally, Plaintiffs, on behalf of themselves and Class

3  members, seek incidental and consequential damages related to their inability to pay

4  bills that would otherwise have been paid using BoA EDD Benefits.

5  111.  Plaintiffs and Class members should be awarded attorneys' fees

6  pursuant to, *inter alia*, Cal. Code Civ. Proc. § 1021.5.

7  ## FIFTH CAUSE OF ACTION

8  ### Breach of Contract (on behalf of the Regulation E Class)

9  112.  Plaintiffs reallege and incorporate paragraphs 1 through 73, as if

10  fully set forth herein.

11  113.  EDD cardholders must agree to the terms and conditions of the

12  Account Agreement in order to use their BoA EDD Cards.

13  114.  The Account Agreement includes a Zero Liability Policy, which

14  states:

15  Federal law [Regulation E] may limit your liability for
   unauthorized transactions on your Account, but you may
16  still be liable in some circumstances.  Under the Bank of
   America "zero liability" policy, you may incur no liability
17  for unauthorized use of your Card up to the amount of the
   unauthorized transaction, provided you notify us within a
18  reasonable time of the loss or theft of your Card number or
   PIN or its unauthorized use . . .

19  115.  The Account Agreement states that what constitutes a "reasonable

20  time" is determined by Bank of America "in its sole discretion," but in no event shall

21  be less than the two business day-period provided by Regulation E.

22  116.  Bank of America's Zero Liability Policy was not extended to

23  Plaintiffs or Class members.  Even where EDD Cardholders provided timely notice

24  to Bank of America of fraudulent transactions made using their BoA EDD Cards,

25  Bank of America effectively subjected them to several hundred dollars' worth of

26  liability by reversing credits previously granted to BoA EDD Benefits accounts.

27  117.  Plaintiffs and Class members have suffered damages as a result of

28  952711.1

PEARSON, SIMON & WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1   Defendants' conduct.

2       118.   Accordingly, Plaintiffs and Class members are entitled to

3   monetary damages and injunctive relief, requiring that Defendants institute basic

4   security measures, *e.g.,* equipping newly issued BoA EDD Cards with EMV chips, to

5   avoid mass account lockouts in the future.

6       119.   Plaintiffs and Class members should be awarded attorneys' fees

7   pursuant to, *inter alia*, Cal. Code Civ. Proc. § 1021.5.

8                        **SIXTH CAUSE OF ACTION**

9   **Violation of Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.**

10                **(on behalf of the Regulation E Class)**

11      120.   Plaintiffs reallege and incorporate paragraphs 1 through 73, as if

12  fully set forth herein.

13      121.   Plaintiffs assert this cause of action pursuant to California's

14  Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*. (the "UCL.")

15      122.   Under the UCL, "unfair competition" is defined as "any unlawful,

16  unfair or fraudulent business act or practice and unfair, deceptive, untrue or

17  misleading advertising and any act prohibited by Chapter 1 (commencing with

18  Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

19      123.   Defendants engaged in unlawful conduct under the UCL by

20  seizing unemployment insurance benefits to which EDD cardholders are lawfully

21  entitled.

22      124.   Defendants' conduct was "unlawful" under the UCL in that it

23  violated the California Consumer Privacy Act and Regulation E.

24      125.   Defendants' conduct was "fraudulent" under the UCL in that Bank

25  of America erroneously claimed that funds were debited by the EDD, although Bank

26  of America in fact debited the funds.

27      126.   Defendants' violation of the UCL directly and proximately caused

28  Plaintiff and Class members to lose unemployment insurance benefits to which they

952711.1

PEARSON, SIMON & WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

PEARSON, SIMON & WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1  are lawfully entitled.

2      127.   Plaintiffs, on behalf of themselves and Class members, seek: (a)
3  an injunction prohibiting Defendants from unlawfully debiting unemployment
4  insurance benefits; and (b) disgorgement of all unemployment insurance benefits by
5  which Defendants have been unjustly enriched.

6      128.   Plaintiffs and Class members should be awarded attorneys' fees
7  pursuant to, *inter alia*, Cal. Code Civ. Proc. § 1021.5.

8                    **<u>PRAYER FOR RELIEF</u>**

9      WHEREFORE, Plaintiffs and members of the Class pray for relief and
10 judgment against Defendants, as follows:

11     1.    For an order certifying the Class and appointing Plaintiffs as Class
12 Representatives and their counsel as Class Counsel;

13     2.    For all damages suffered by Plaintiffs and the Class, including but not
14 limited to actual, statutory, compensatory and incidental damages;

15     3.    For restitution and restitutionary disgorgement to Plaintiffs and the Class
16 of all monies wrongfully obtained by Defendants;

17     4.    For injunctive relief requiring Defendants to cease and desist from
18 engaging in the unlawful, unfair, and/or deceptive practices alleged in the Complaint;

19     5.    For an award of punitive damages pursuant to applicable law;

20     6.    For Plaintiffs' reasonable attorneys' fees, pursuant to, *inter alia*, Cal.
21 Code Civ. Proc. § 1021.5;

22     7.    For Plaintiffs' costs incurred;

23     8.    For pre-judgment and post-judgment interest at the maximum allowable
24 rate on any amounts awarded; and

25     9.    For such other and further relief that this Court deems just and proper.

26 / / /

27 / / /

28 / / /
952711.1

## **DEMAND FOR JURY TRIAL**

Plaintiffs request a trial by jury of all claims that are so triable.

DATED:  April 20, 2021

**PEARSON, SIMON & WARSHAW, LLP**
DANIEL L. WARSHAW
BOBBY POUYA
SOPHIE R. SEDAGHAT

**BOUCHER LLP**
RAYMOND P. BOUCHER

By:    */s/ Daniel L. Warshaw*
⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
DANIEL L. WARSHAW
Attorneys for Plaintiffs and the Proposed Class

CLASS ACTION COMPLAINT

PEARSON, SIMON & WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403